(No. 35749

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH CALHOUN, Plaintiff in Error.

*Opinion filed March 29, 1961.—Rehearing denied May 17, 1961.*

HOWARD T. SAVAGE, of Chicago, for plaintiff in error.

WILLIAM L. GUILD, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and FRANCIS X.

RILEY, and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

At the 1958 January term of the Cook County criminal court, Joseph Calhoun, plaintiff in error herein, and Floyd Williams were indicted for selling narcotics to Jacqueline Hill on January 6, 1958. Both defendants were found guilty on a trial without a jury and both sentenced to the Illinois State Penitentiary for an indeterminate term of 25 years minimum and life maximum. Only Calhoun is seeking a reversal on this writ of error.

The principal argument presented on behalf of defendant is that the proof did not sustain the charge. It would be a difficult task to detail all the evidence with its many ramifications and conflicts appearing in the 1100 page transcript which we have carefully studied. Briefly we will undertake to convey a fairly complete factual picture.

Jacqueline Hill was a young waitress who had acquired the habit of using heroin. The police had found her in possession of narcotics and persuaded her to assist them in procuring the arrest and conviction of the sellers of the drug. They gave her one $5 bill and five $1 bills and made a record of the serial number of each. The police matron searched Jacqueline to make sure that she did not have hidden on her person or in her clothes any drugs or currency. Four police officers, Engelsman, Coffey, Halley and McInerny, and Jacqueline were not successful in making a purchase on their first two stops, but on the third they arrived in a six-story flat building at 28 North Ogden Avenue. After Jacqueline had been in the building only a few minutes the officers entered, met Jacqueline on the third floor, whereupon she turned over to the police a package of heroin and pointed to Williams as the one from whom she had made the purchase. She did not involve Calhoun in the transaction.

Engelsman testified that after Williams was arrested and taken into his apartment, he and officer Coffey went to the end of the hall to a bathroom where, through a small crack, they saw Samuel Jackson sitting on the toilet and defendant Calhoun standing near a window. Engelsman yelled "Police officer, open the door." They saw Calhoun throw keys and currency out the window. The keys landed on the window sill and the money disappeared. Officer Coffey aroused the janitor who accompanied him to an air-shaft below the bathroom window where they found the marked five and one-dollar bills. Officers Engelsman and Coffey then took the keys that defendant undertook to throw out the window, and discovered that one fit the hall door on the fourth floor and the other opened the door of an apartment containing only a bed, dresser and some chairs. In this room was found four tin-foil wrapped packages of white powder.

Jacqueline made and signed the following statement in the presence of Williams and defendant at the police station: "I took one five dollar bill and five single dollar bills from the officer after he had marked the numbers down on a piece of paper. I went up to the third floor of this building, knocked on the door. Floyd Williams left me in the flat and I handed him the ten dollars. He then left the room and returned in a few minutes with the stuff. After he gave me the stuff I left the room and met the officers outside in the hall and gave the powder to Officer Engelsman. Then I went back upstairs and pointed out Floyd Williams as the man who had sold me the stuff."

Jacqueline was called as a witness for the prosecution and after receiving assurances of immunity by both the Federal and State authorities, proceeded to testify. She seemed to remember the transaction of January 6th differently than what appeared in her written statement. She said that she did not make a purchase from Williams; that the powder that she delivered to the officers had been secreted

in her coat sleeve; that she threw the currency that was given her by the police through a crack in the window that overlooks the air shaft. The court was not impressed with this revised version. The State was indeed surprised with this change in testimony and it was permitted to cross-examine the young lady. Defendant contends that this was error. We do not agree. Even if it were, it was somewhat condoned, for defendant's counsel was confronted with the same problem shortly thereafter. Samuel Jackson, appearing as a witness for defendant, testified to a series of facts that were a surprise and seriously damaging, so counsel was permitted to show on cross-examination that he was so intoxicated at the time of the occurrence that he wasn't sure about anything. Calhoun feebly explained his presence in the bathroom by stating that he and Jackson were there drinking Scotch whiskey. Calhoun testified that they placed the empty bottle on the bathroom floor, but Jackson said it was tossed out the window. Calhoun testified that the officers said nothing about money being thrown through the window, but Jackson contradicted this.

Williams was not convincing in his explanation of the unexpected visit to his apartment by Jacqueline. A reading of the cold record of his testimony reveals many earmarks of falsity. There was equivocation, evasiveness, vagueness on critical issues and failure to present a plausible, coherent story. The trial judge, additionally, had the advantage of observing Williams while he was testifying. So much is revealed by the tone of voice, facial expressions and general demeanor of a witness. The trial judge, in his search for the truth, ruled against both defendants. We are convinced that his determination was correct.

One is compelled to lose faith in Calhoun's honesty when the following excerpt from his testimony is read:

"Q. What did Officer Halley ask you?

A. He asked me, 'Did I have the money, did I throw that money out a window?' I said, 'No,' He said, 'Well,

you was in the bathroom.' I said, 'Sure, I was, but I didn't throw any money out a window.' He said, 'Did Sam throw it out?' I said, 'No.' He said, 'He is in the room.' He say, 'You can tell me.' I said, 'No, he didn't throw nothing out.' I said, 'They was in the washroom.' So he asked me at that time, he say, 'Of course, you can help yourself if you want to get somebody for us.' I said, 'For what?' I said 'What am I charged with?' So he say, '193, 131—193—131, or something.' I said, 'What's that?' He didn't tell me. And Officer Engelsman said, 'Well, I am going to say I saw you throw this money out.' And I said, 'Well if you say that, you will be saying something wrong.' 'Well,' he said, 'I will swear to it.' So, I say, 'Well, go ahead.' So, he took me back in the room."

Only desperation and rank dishonesty would drive one to fabricate such a preposterous story.

The trial was hard fought for seven days. The presiding judge exhibited commendable patience and fairness. The defendants were accorded every reasonable opportunity to demonstrate their innocence.

Counsel for defendant does not contend that the powder purchased by Hill was not forbidden merchandise. He does argue with considerable force that the only connecting link between Calhoun and the Hill transaction was his possession of the marked money only minutes after the sale was made. There was evidence that Williams went from his apartment on the third floor to the fourth floor. Upon his return he delivered a package of heroin to Hill. Calhoun not only had the marked money but had the keys to the apartment on the fourth floor which was found to contain packages of white powder similar to the one sold Hill. The inference is strong that Williams acquired the drug from Calhoun who had similar packages stored in the room on the fourth floor which was opened with one of the keys that Calhoun undertook to throw out the window. The defendant's effort to rid himself of the marked currency and

the keys to the supply room does not support his protestation of innocence. We feel that the trial court could reasonably infer from all the facts appearing in this record that both Williams and Calhoun were involved in the narcotic traffic in that building on the occasion in question. Although Hill did not contact Calhoun personally in negotiating the disputed purchase, he cannot escape guilt if he participated in the transaction. *People* v. *Aldridge,* 19 Ill.2d 176; *People* v. *Glass,* 16 Ill.2d 595; *People* v. *Shannon,* 15 Ill.2d 494.

For a defendant who had no previous record of delinquency, it seems that the penalty imposed here is a little severe but it is within the statutory range. We have no authority to impose a different sentence.

*Judgment affirmed.*